

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

March 20, 2025

**BY ECF & EMAIL**

The Honorable Vincent L. Briccetti
United States District Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601

      Re:    *United States v. Paul Bielecki*, 24 Cr. 639 (VB)

Dear Judge Briccetti,

      The Government respectfully submits this letter in advance of the sentencing of defendant Paul Bielecki, a/k/a "Paul HRH Saxe-Coburg-Gotha," scheduled for March 27, 2025, at 2:30 p.m. Bielecki pled guilty pursuant to a plea agreement to one count of wire fraud, in violation of Title 18, United States Code, Section 1343. The applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 51 to 63 months' imprisonment, as stipulated to under the parties' plea agreement and as correctly calculated by Probation in the Presentence Report ("PSR"). For the reasons explained below, a sentence within that Guidelines range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I.   Factual Background**

      Paul Bielecki is a friar in the Province of St. Mary of the Capuchin Order (the "Province of St. Mary" or the "Province"), a Catholic order of priests and brothers. (PSR ¶ 10). Friars in the Capuchin Order, including Bielecki, take a vow of poverty that requires them to renounce and not to hold any property or bank accounts in their name for their personal benefit. (PSR ¶ 11).

      Despite taking this vow of poverty, for almost a decade, Bielecki abused his position as a friar to facilitate a fraudulent scheme and enrich himself. Specifically, from at least June 2015 through his arrest in August 2024, Bielecki executed a scheme to defraud victims by falsely representing that he was a medical doctor who runs medical clinics in Beirut, Lebanon, in order to fraudulently obtain donations from victims, when in fact, Bielecki is not a doctor, Bielecki did not run medical clinics in Beirut or elsewhere, and Bielecki was converting the victims' donations for his personal use. (PSR ¶¶ 9, 14-15). In total, Bielecki obtained at least $563,448 from more than 350 individual victims through his scheme. (PSR ¶ 22).

### A. Bielecki's Fraudulent Scheme

For nearly a decade, Bielecki fraudulently raised money from victims by falsely claiming that he operated two medical clinics in Lebanon and was raising money for medicine, medical equipment, baby incubators, food, and an ambulance for those clinics. (PSR ¶ 14(b)). To support this scheme, Bielecki told victims numerous additional lies, including falsely stating that he was a physician, vascular surgeon, cardiac surgeon, and/or general surgeon, who had earned multiple Ph.D. degrees. (PSR ¶ 14(a)). And Bielecki regularly lied to victims about his whereabouts, including claiming to have been badly injured—and his fake clinics badly damaged—by a widely reported August 2020 explosion in Beirut, Lebanon, when in fact Bielecki was in the United States in August 2020 and his clinics did not exist. (PSR ¶ 14(c)).

To find victims, Bielecki repeatedly appeared as a guest or through advertisements on a particular podcast and local New York radio show, during which Bielecki touted his credentials as a Catholic priest and falsely claimed he was a physician living in Lebanon and running medical clinics there that assisted Christians living in the Middle East, among others in need. (PSR ¶¶ 13, 18). Bielecki abused his position as a friar, fraudulently soliciting donations by telling the same lies at church masses and through other church events and channels. (PSR ¶ 15(c)). Bielecki also defrauded victims by appearing on additional media programs and organizing fundraising campaigns through online crowdfunding websites. (PSR ¶¶ 13, 15).

From at least November 2016 through at least July 2019, Bielecki turned the church into an unwitting accessory to his crime, directing victims to make out checks to the Province of St. Mary, with "Fr. Paul Bielecki's Mission" or a similar endorsement on the memo line. (PSR ¶ 15(a)).[1] In March 2021, Bielecki—with the help of a victim who believed Bielecki's lies—founded a non-profit entity, "St. Francis in Beirut Inc."; thereafter, Bielecki directed victims to send donations by mail to his new entity, at the address of the Capuchin Order friary, where Bielecki resided. (PSR ¶ 15(b)). Bielecki also communicated directly with victims via email, and often directed those victims to send donations directly to his bank account via wire transfer, Zelle payment, or similar means. (PSR ¶ 15(d)).

Despite taking a vow of poverty, Bielecki used the donations he fraudulently received to fund lavish personal spending, including hundreds of thousands of dollars in personal expenses, such as a $334.40 per month membership at a luxury gym chain, multiple trips to the Hamptons, and numerous meals at high-end restaurants. (PSR ¶ 17).

Bielecki's defrauding of a particular victim ("Victim-1") is illustrative. Between March 2018 and February 2024, Bielecki exchanged more than 150 emails with Victim-1—many of which contained Bielecki's false representations about his medical clinics in Lebanon—resulting in Victim-1 and her husband transferring a total of approximately $84,000 to Bielecki for his medical clinics during that period. (PSR ¶ 18(h)).

---

[1] The Province itself did not knowingly assist Bielecki's offense. To the contrary, the Province conducted an internal investigation of Bielecki's fraudulent scheme, referred the matter to the Government, and provided assistance in the Government's investigation. (PSR ¶ 10).

After Victim-1 had already begun sending money to Bielecki, on December 24, 2021, Victim-1 emailed Bielecki wishing him and "the people of Lebanon . . . many blessings of consolation and peace during this Holy Season." (PSR ¶ 18(a)). On January 7, 2022, Bielecki replied that he was "buying a new ambulance" that would "allow [him] to visit villages far north and provide medical help," while Bielecki was, in fact, present in the United States. (PSR ¶ 18(a)). On January 15, 2022, Victim-1 replied, expressing her happiness that "the many prayers for an ambulance were answered," offering her and her husband's "additional assistance to you for purchasing supplies and fuel to undertake this mission," and stating that there "will be a deposit into your account next week." (PSR ¶ 18(b)). Victim-1 then wired $10,000 to Bielecki with a wire notation of "Mission Help" on January 26, 2022. (PSR ¶ 18(b)). On January 27, 2022, Victim-1 confirmed that a "deposit to help with the ambulance expenses and for the desperate needs of the people" had been "placed into [Bielecki's] account." (PSR ¶ 18(b)). On February 1, 2022, Bielecki emailed Victim-1 to thank her and to note that he was "finalizing ambulance, so excited thanks to you." (PSR ¶ 18(c)).

But Bielecki did not use the $10,000 to buy an ambulance, to assist any medical clinic in Lebanon, or to support any charitable or religious cause. (PSR ¶ 18(c)). To the contrary, Bielecki instead quickly began researching "laser assisted liposuction," and, on February 15, 2022, Bielecki attended a "Body Contouring Examination" appointment at a New York-based liposuction clinic, during which Bielecki scheduled a $15,000 aesthetic plastic surgery procedure. (PSR ¶ 18(d)). Shortly after attending that appointment, Bielecki emailed Victim-1 (pictured below) and falsely stated that he had already used the ambulance to assist a "few villages with medical help" and that "[p]eople were crying," and informing Victim-1 that Bielecki would have to wait to purchase a generator because "I used all the help for ambulance and medical supplies." (PSR ¶ 18(e)). On March 8, 2022, Bielecki received the planned $15,000 aesthetic plastic surgery procedure at the New York-based liposuction clinic. (PSR ¶ 18(f)). One week later, Bielecki and Victim-1 exchanged approximately four emails, in which Bielecki asserted that he was in Lebanon, "doing our best to keep surgeries running" and continuing to "[v]isit villages," when, in fact, Bielecki was in New York City, where he made a $1,000 cash withdrawal and made purchases at a high-end men's clothing story and a high-end coffee-and-juice chain. (PSR ¶ 18 (g)).



*Bielecki's February 15, 2022 Email to Victim-1*

### B. Bielecki's Efforts to Avoid Detection

Bielecki undertook extensive efforts to conceal his scheme and its proceeds not only from victims and law enforcement but also from the Province of St. Mary and his fellow friars. (PSR ¶ 19). Bielecki—who also used the names "Pawel Bielecki," "Paul HRH Saxe-Coburg-Gotha," "Dr. Phaakon Sonderburg-Glucksburg," "Father Paul," "Father Kowal," "Paul Haakon Harald Bielecki (House of Glucksburg)," and "Paul Son Altessehaakon Harald Bielecki (House of Glucksburg)," among others, in his scheme—constructed an elaborate false backstory about his work conducting advanced medical research. Specifically, Bielecki repeatedly represented to the Province and others that he was conducting advanced, confidential scientific research on behalf of the United Nations (the "UN") and the Defense Advanced Research Projects Agency ("DARPA"), a research and development agency within the United States Department of Defense, and Bielecki even went so far as to submit tax documents to the Province for the 2020-2022 tax years purporting to reflect income from the UN for this work. (PSR ¶ 19(a)).

Bielecki created multiple web domains and numerous email addresses under a variety of aliases, including those described above, to support his cover-up. PSR ¶ (19(c)). In the summer of 2022, the Provincial Minister of the Province, whose duties include overseeing employment by friars in the Province, attempted to verify Bielecki's claimed employment with, and income from, the UN and/or DARPA. (PSR ¶ 19(c)). Rather than come clean, on August 11, 2022, Bielecki created the web domain "darpa-un.org" and registered several email addresses at that domain. (PSR ¶ 19(c)). The same day, Bielecki emailed the Provincial Minister from one of the newly created email addresses at "darpa-un.org," using the alias "dr. PHaakon Sonderburg-Glucksburg," claiming to be in charge of "Darpa-UN scientific projects" and offering to verify the work of "Dr. Bielecki." (PSR ¶ 19(c)).



*August 11, 2022 Cover-Up Email Sent by Bielecki Using "Glucksburg" Alias*

On August 12, 2022, the Provincial Minister responded to "Glucksburg" requesting information and an on-site visit. (PSR ¶ 19(c)). Bielecki, posing as "Glucksburg," responded the same day with a multi-paragraph message falsely raving about Bielecki's scientific research, noting that "Glucksburg" was based "in South Asia" and thus could not meet with the Provincial Minister, and stating Bielecki could not take the Provincial Minister for an on-site visit to "the UN research center because of UN covid policy." (PSR ¶ 19(c)). On August 16, 2022, the Provincial Minister responded to "Glucksburg," stating that he needed to meet with someone at "UN-DARPA" to go over Bielecki's contract and noting that the contract that Bielecki had

provided to the Province was more than two years old and signed by a "Dr. Ho Sonoda." (PSR ¶ 19(c)). Bielecki, of course, had no contract with the UN or DARPA and had forged the document he had provided to the Province and invented Dr. Ho Sonoda. The Provincial Minister asked if a meeting with "Dr. Ho Sonoda" would be possible. (PSR ¶ 19(c)). The next day, Bielecki, posing as "Glucksburg," responded that he had replaced Dr. Sonoda, that the "HR for all UN people" is based in Budapest, and that "Glucksburg" was personally responsible for extending contracts for "UN-Darpa scientists." (PSR ¶ 19(c)).

Once again, rather than coming clean, Bielecki instead dug deeper, creating a fake email address for "Dr. Ho Sonoda" at the fake darpa-un.org web domain that Bielecki had registered. On August 27, 2022, Bielecki, posing as "Dr. Ho Sonoda," emailed the "Glucksburg" email address (as well as a fake "Human Resources" email address also created by Bielecki). (PSR ¶ 19(c)). In the email, "Dr. Sonoda" states that she has retired, provides rave reviews of Bielecki's credentials and scientific work on behalf UN-DARPA, and notes that she has copied the HR department on the email "[j]ust in case." (PSR ¶ 19(c)). On August 28, 2022, Bielecki, posing as "Glucksburg," responded to the email adding the Provincial Minister to the email thread (pictured below), so that the Provincial Minister could see the email from "Dr. Sonoda" sent the prior day. In the August 28 email, "Glucksburg" apologized to "Dr. Sonoda" for interrupting her "well deserved retirement in Japan" and directed the Provincial Minister to address any questions to "Dr. Sonoda." (PSR ¶ 19(c)).



*August 27-28, 2022 Cover-Up Emails Sent by Bielecki Using Multiple Aliases*

The darpa-un.org emails successfully derailed the Provincial Minister's inquiry, and, apparently, inspired Bielecki to use the same email addresses to spread new lies. In particular, Bielecki began to use the same falsely registered email addresses to provide false references for himself to obtain two separate full-time employments—one as the Chief of Human Resources for

the United States branch of a mid-size international bank, and one as the Chief of Human Resources and Title IX Coordinator for a Manhattan-based nursing college. (PSR ¶ 20). Specifically, Bielecki provided fake references and fake emails from purported supervisors at "DARPA-UN" and "Deutsche Group" to falsely recommend himself in order to obtain these jobs, which he continued to hold through the date of his arrest in August 2024. (PSR ¶ 20).[2]

Bielecki's subterfuge did not stop at aliases, false tax documents, and fake websites and email addresses. Bielecki also used numerous physical props and disguises in furtherance of his fraudulent scheme. (PSR ¶¶ 19-20). To begin, Bielecki had fake foreign passports for at least two of his aliases—a Norwegian passport issued to "Paul Haakon Harald Bielecki (House of Glucksburg)," and a French passport issued to "Paul Son Altessehaakon Harald Bielecki (House of Glucksburg)." (PSR ¶ 19(b)). Further, after the August 2020 explosion in Beirut, Lebanon, in which Bielecki falsely claimed to be injured, Bielecki walked around using crutches—which were later found during a search of Bielecki's residence at the friary—to back up his false statements about being present for and injured in the explosion. (PSR ¶ 20). Similarly, when Bielecki was arrested for the instant offense on August 17, 2024, at John F. Kennedy International Airport, as he was about to board a first-class flight to Paris, France, Bielecki had a fake United Nations photo identification card under the name "Dr. Paul HRH Sonderburg," which falsely listed him as the Chief of the Health Care Emergency Unit. (PSR ¶ 20). And, during a search of Bielecki's residence at the friary following his arrest, agents found a white lab coat with a patch stating, "Dr. P. Bielecki, M.D., Ph.D, NYU Medical Center Transplantation Research." (PSR ¶ 20).

By abusing his position as a friar and going to the above-described extreme lengths to trick victims and conceal his fraud, Bielecki obtained at least $563,448 from more than 350 victims over the course of an almost decade-long scheme. (*See* PSR ¶ 21).

### C. Impact on Victims

#### 1. Individual Victims

Bielecki defrauded hundreds of victims, many of whom were devout Catholics introduced to Bielecki through church-related events and networks. In addition to Victim-1, described above, the stories of a few victims are highlighted below.



▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ sent a total of $13,400 to Bielecki's bank account and provided an additional sum in cash, which ▬▬▬▬▬ estimates to be in the range of $6,500. ▬▬▬▬▬ was introduced to Bielecki at the parish house of ▬▬▬▬▬ at an event hosted by the parish priest. She "was impressed by Father Paul's charitable work as a missionary on behalf of Lebanese Christians in Beirut" and "gladly contributed to his cause." ▬▬▬▬▬ shared with Bielecki her family history—including that her parents and siblings had been

---

[2] Indeed, even after his arrest and detention at the Westchester County Jail ("WCJ"), on August 23, 2024, Bielecki sent a handwritten letter from WCJ to the head of the nursing college stating that Bielecki had "lost all [his] belongings, laptop + phone etc." and would need to take his paid time off and unpaid leave days due to "[a] lot of family issues" but would be back at work "by Friday, September 31, 2024." The letter is signed "Paul B., HR Director."

removed from and dispossessed of their family home during the German invasion of Poland in 1939 and "survived the ordeal and death only thanks to" the efforts of a priest. ███ explains that "[h]aving lived in appreciation for the survival of the family [thanks] to that noble priest," she fell for "the fictitious charity of Father Paul's" and became "a victim of his crime." *See* Victim Impact Statement ("VIS") No. 15 (PDF pp. 37-39).

███ made donations totaling more than $11,000 to Bielecki's clinics. ███ "met Fr. Paul through friends in 2016 and was in awe of the noble (and dangerous) work that he was doing in Lebanon." According to ███ learning that "this was all a fraud is extremely disheartening." ███, in particular, notes that she made most of her donations in memory of her recently passed aunt and uncle, and, at the time, "I felt like helping save the lives of babies in Lebanon was a beautiful way to honor their memory and to help me in the grieving process." Now, ███ says, "[t]o learn that this was a lie is very painful and puts a black stain on how I coped with their passing." *See* VIS No. 4 (PDF pp. 8-9).

███ sent $10,000 by check to Bielecki's sham St. Francis in Beirut Inc. charity. ███ describes her victimization as not just "FINANCIAL" but also "EMOTIONAL" and even "PHYSICAL[]." In the months leading up to her donation, ███ weighed giving the proceeds of an annuity—*i.e.*, the $10,000—to multiple religious charities, but ultimately chose Bielecki's fake clinics in Lebanon. ███ explains: "My reverie was of the children in Lebanon receiving some of my medicine whereby they could get out of bed pain-free and play with their friends. However, those wonderful thoughts abruptly ended when in August I read in the N.Y. Post the shocking news of a Fransciscan Priest [and] Doctor who was a FRAUD. My money had never gone to even one injured child. He's not a surgeon; there is no hospital." ███ recounts that "as days moved, on the 'whys,' 'what-ifs,' [and] the 'if-onlys' began. Some still exist. Why was I so stupid? Why didn't I give ½ of the money to him and the other ½ to [another charity]." ███ realizes that she had trusted Bielecki due to his position—thinking at the time "I'm dealing with a Priest"—including due to having "had friends who were or became Priests" whom she had "never had cause to distrust." Despite the grave breach of trust committed by Bielecki, ███ now has "faith that there will be positive results stemming from our legal system"—*i.e.*, sentencing and restitution in this case. *See* VIS No. 16 (PDF pp. 40-43).

███ sent $3,000 by check to support Bielecki's fraudulent clinics. ███ explains: "I am a Roman Catholic, as I suspect most of the victims are, and served as ███, where Paul Bielecki offered Mass and spoke on a several occasions." ███ "concern lies not only with the financial harm which Bielecki has caused to others, but the spiritual and emotional damage he has created among those whom he duped, and who may now question their relationship with the Church." Some months after ███ made the donation, Bielecki told ███ "how the incubator my contribution had been used to purchase[] had saved lives." ███ then told Bielecki that her friend would be in Lebanon and wanted to visit the clinics, to which Bielecki first responded that "the hospital is not located in Beirut [but rather] in the mountains," and then, when ███ was undeterred, later responded that the clinics "have been attacked by Isis, and it is very dangerous and we are closing the clinic." Despite becoming convinced in that moment that Bielecki and his clinics were a sham, ███ did not speak up against Bielecki because "everyone spoke of how wonderful a person he was and how great his work, and what could I prove?" ███ says that although in the past she has "extensively shared [her] good fortune with various organizations," she is "now

unwilling to do so" after her victimization at the hands of Bielecki. But, according to ▮, "the greater damage that Bielecki has caused is the despair among various individuals whom I know, who say that they now fear that the institution of the Church (in this case the Roman Catholic Church) is lost and beyond repair." ▮ emphasizes: "It is the uncertainty, doubt and moral damage that Bielecki has caused through his actions that requires punishment." *See* VIS No. 10 (PDF pp. 20-23).

▮ gave at least $995 to Bielecki via a crowdfunding website. Scanlon met Bielecki because he "was a repeated guest priest at our church, ▮." ▮ reports that Bielecki's "greed and long con have shaken my family's faith," with more significant "spiritual and mental health costs" than financial ones. ▮ and other victims she's spoken to "all feel like Pawel Bielecki took total advantage of his position as a fake man of God administering to people seeking soul guidance, wanting to help in war-torn Lebanon." Put simply, "Bielecki's lies are painful." ▮ explains: "We even had this man over for dinner to our house, and at the time he invented even more falsehoods seemingly based on [what] he might've thought we wanted to hear. . . [H]e was a surgeon, he taught at NYU, he had cancer—how could all this be true! I cringe at my own gullibility. Our trust in the Catholic Church has eroded. I'm having a hard time dealing with my emotions—I used to like this guy." *See* VIS No. 3 (PDF pp. 6-7).

▮ gave at least $15,000 to Bielecki through various means. ▮ met Bielecki at a church mass in 2021, at which Bielecki was introduced and spoke about the August 2020 explosion in Beirut. ▮ "was a single parent with no financial support or family nearby to help." However, ▮ weighed whether to donate to Bielecki or to a cancer patient based in Florida. ▮ decided to donate to Bielecki, and explains that "the *real* victim is [the] cancer patient who is trying to survive in Florida." ▮ further explains that her "good reputation has been damaged by recommending and donating to the Beirut fundraiser," and that she was "completely blind-sided and emotionally wrecked after discovering the scam." ▮ notes that while "we all make mistakes," the "standard for priests is supposed to be a moral high bar." As a result of the "trust issues" arising from her victimization by Bielecki, ▮ has "cancelled all my pro-bono projects," "refuse[s] to get involved in any charitable activities," and "will avoid any extracurricular events that involve [her church] or the Capuchin Friars." *See* VIS No. 11 (PDF pp. 24-28).

Several additional victims point out that the real victims of Bielecki's fraud were the people in Lebanon who did not receive medical equipment and treatment, as well as the other worthy charities that did not receive donations that were instead directed to Bielecki.





D.  **Procedural History**

On August 19, 2024, the defendant was presented before the Honorable Andrew E. Krause, United States Magistrate Judge for the Southern District of New York, and was detained on consent, without prejudice to making a future bail application. (Dkt. 2). On August 30, 2024, a detention hearing was held before the Honorable Victoria Reznik, United States Magistrate Judge for the Southern District of New York, who ordered the defendant detained based on risk of flight.

II.  **The Plea and Guidelines Calculation**

On November 14, 2024, Bielecki pleaded guilty, pursuant to a plea agreement, to one count of wire fraud, in violation of Title 18, United States Code, Section 1343. (PSR ¶¶ 2, 4). As reflected in the parties' plea agreement and correctly calculated in the PSR, the applicable Guidelines range is 51 to 63 months' imprisonment. (PSR ¶¶ 4, 89). In particular, pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7. Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), 14 levels are added because the offense involved a loss of approximately $563,448. Two levels are added, pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved 10 or more victims. Two levels are added, pursuant to U.S.S.G. § 2B1.1(b)(9)(A), because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization. Two levels are added, pursuant to U.S.S.G § 3B1.3, because the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense. Two levels are added, pursuant to U.S.S.G § 3C1.4 and the parties' stipulation pursuant to U.S.S.G. § 1B1.2(c), because the defendant violated Title 18, United States Code, Section 3559(g)(1), by knowingly falsely registering the domain name "darpa-un.org" using a false name and email account and knowingly using that domain name in the course of the offense. Three levels are removed for acceptance of responsibility, and an additional two levels are removed, pursuant to U.S.S.G. § 4C1.1, resulting in a final offense level of 24. Bielecki is in Criminal History Category I, which yields an advisory range of 51 to 63 months' imprisonment.

Probation recommends a sentence of 51 months' imprisonment. (PSR at 32). Probation explains that "Bielecki, who took a vow of poverty, used his position as a friar to facilitate the scheme and thereby abused this position of trust." (PSR at 32). Probation, having reviewed letters from victims, notes that "the impact of Bielecki's criminal conduct extends beyond the [financial] amount in which [the victims] were individually defrauded" and could "result in a lack of trust in charitable organizations." (PSR at 32). Ultimately, Probation concludes, "Bielecki was the sole perpetrator of the fraud which occurred over a period of more than nine years and resulted in a financial loss to numerous victims who may never be made whole," and there are not "any mitigating factors . . . sufficient to override the seriousness of the instant offense." (PSR at 33).

The defendant seeks a sentence of 30 months' imprisonment based on the defendant's childhood, mental health, remorse, and lack of criminal history. Dkt. No. 21 ("Def. Sent'g Ltr.") at 1.

### III. Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). Thus, district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After calculating the applicable Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence for criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### IV. A Sentence Within the Applicable Guidelines Range Is Appropriate

Under the above framework, the Government respectfully submits that a sentence within the applicable Guidelines range of 51 to 63 months' imprisonment is sufficient but not greater than necessary to comply with the purposes of sentencing, taking into account the factors set forth in 18 U.S.C. § 3553(a). In particular, the nature and seriousness of the offense, the need to promote

respect for the law and to protect the public, and the need to promote adequate deterrence all cut in favor of a sentence within the Guidelines range.

*First*, a sentence within the Guidelines range is necessary to reflect the nature of the offense and the seriousness of Bielecki's conduct. Bielecki is priest and friar who abused his position in the Capuchin Order of the Catholic Church to deceive hundreds of individual victims—many of whom were devout followers of the religion in which he held a sensitive position of trust—as well as the church itself. For at least nine years, the defendant repeatedly lied at church, on the radio, online, and in victims' homes about, among other things, his medical background and the very existence of medical clinics in Lebanon for which the defendant claimed to be raising money. As a result of his lies, the defendant was held up as a pillar of the community and obtained more than $550,000 through hundreds of small and medium-sized donations from victims who believed they were providing medical assistance to needy people in Lebanon. Bielecki instead spent that money—all of it—on a lavish lifestyle, while living rent-free at a friary in Manhattan.

Indeed, the fraud guideline, U.S.S.G § 2B1.1, with its emphasis on loss amount, vastly understates the seriousness of the offense here. This was not a single lie, told to a faceless third-party or the investing public, leading to millions of dollars in losses in one fell swoop. Bielecki, for nine years, spoke as a priest and looked victims in the eye and told brazen lies about invented charitable work. He created fake identification, obtained medical costumes, and even walked around with crutches and a limp to support his fraud. And when challenged, he registered a fake web domain and email addresses to create an elaborate cover-up story involving medical research for "UN-DARPA." Bielecki egregiously breached the trust of each and every one of his hundreds of victims, many of whom now report a loss of faith in religious and charitable organizations. A sentence within the applicable Guidelines range appropriately accounts for the seriousness of Bielecki's offense and the depth of his breach.

*Second*, the need to promote specific deterrence and respect for the law, and to protect the public, support a sentence within the applicable Guidelines range. Although Bielecki has no prior convictions, he has been conducting his fraudulent scheme since at least 2015. Put differently, for the vast majority of the time since he first moved to the United States in 2011, Bielecki has been carrying out an increasingly elaborate fraud.

The brazenness of Bielecki's lies further emphasizes the need to promote specific deterrence and to protect the public. Bielecki did not simply raise money for a fake charity using his position of trust—bad enough as that alone would be. Rather, his conduct in doing so—and in covering up the fraud—speaks to an almost instinctual inclination to lie and dissemble. For example, as set forth above, Bielecki did not merely take Victim-1's money, which Victim-1 had donated to pay for an ambulance; rather, Bielecki immediately spent the money on aesthetic plastic surgery while, at the same time, emailing Victim-1 completely fabricated stories about saving lives in Lebanon using the ambulance (and planting the seed, for future donations, that an electrical generator was also needed). Bielecki did not merely say he was a doctor; he also invented an important research role at "UN-DARPA," complete with fake identification cards and email addresses for his purported supervisors. And once he learned how effective the fake email addresses were, Bielecki—apparently not satisfied with his fraud proceeds and priestly duties—obtained two full-time, well-paying jobs as head of human resources for two separate organizations. One victim perhaps best captures Bielecki, explaining that when her family had

him over for dinner at their house, "he invented even more falsehoods seemingly based on [what] he might've thought we wanted to hear." VIS No. 3 (PDF p. 7). Bielecki is a practiced and talented liar, and he must be deterred—and the public protected—from putting those talents to use in the future. The imposition of real consequences, in the form of a Guidelines sentence, is necessary to actually deter the defendant, promote respect for the law, and protect the public from further violent crimes.

*Finally*, a sentence within the Guidelines range would serve the purpose of general deterrence. Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id.* It is particularly important to deter those who hold a position of trust, for whom the temptation and opportunity to commit economic crimes is especially acute. The need for general deterrence is magnified in cases, such as this one, which have received significant media interest and thus are more likely to get the attention of would-be criminals.[3] A sentence within the Guidelines range here will send the message that white collar crime—especially when committed by people in a position of trust—will result in serious penalties.

Moreover, the mitigating factors identified by the defense do not support a downward variance. First, the defense discusses Bielecki's difficult childhood in Poland, *see* Def. Sent'g Mem. at 5-6, but the defendant is now 49—and even at the start of his fraudulent scheme, the defendant was 40, a priest, a Master's degree holder, and a naturalized U.S. citizen. Bielecki's distant childhood does not justify a variance. Second, the defense points to untreated mental health issues. Def. Sent'g Mem. at 6-7. This factor is unavailing for the same reasons. Moreover, as the defense notes, "[i]t is evident from the conduct in the case that [Bielecki] does not have healthy coping mechanisms." Def. Sent'g Mem. at 6. While that may be true, the patent "unhealthiness" of Bielecki's conduct here speaks to the seriousness of the offense and the need to deter the defendant, not a justification for a downward variance.

In sum, a sentence within the applicable Guidelines range would adequately balance the various considerations under § 3553(a) and would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

---

[3] *See, e.g.*, Dean Balsamini, "NY conman cleric 'Father Paul' used $650K in phony charity donations to fund lavish lifestyle, plastic surgery: feds," NEW YORK POST (Aug. 24, 2024), https://nypost.com/2024/08/24/us-news/conman-cleric-father-paul-used-650k-in-donations-for-phony-charity-to-fund-lavish-lifestyle-plastic-surgery-feds/

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines range of 51 to 63 months' imprisonment.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By: _____
Benjamin Levander
Ryan Allison
Assistant United States Attorneys
Tel: (914) 993-1930

cc: Jane White, Esq.